UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 0:16-cv-60010-COHN/SELTZER

AUTONATION, INC.,

    Plaintiff,

vs.

MARTIN PETERS,

    Defendant.

_____/

## AUTONATION'S EXPEDITED MOTION FOR PRELIMINARY INJUNCTION AND INCORPORATED MEMORANDUM OF LAW

AutoNation, Inc., pursuant to Federal Rule of Civil Procedure 65 and other applicable law, moves this Court on an expedited basis to enter a preliminary injunction against Martin Peters ("Mr. Peters"), and says:

**I.**    **INTRODUCTION**

Mr. Peters became employed with AutoNation in December of 2011 at its Audi Peoria dealership in Peoria, Arizona, and in July of 2012, he was transferred to its Ford Scottsdale dealership as General Manager. As a condition of being employed as an AutoNation General Manager, Mr. Peters was required to sign a Confidentiality, No-Solicitation/No-Hire and Non-Compete Agreement (the "Non-Compete Agreement") with AutoNation which he did on March 1, 2014 (**Exhibit A**, attached). Mr. Peters was paid over $440,000.00 in 2013, over $480,000.00 in 2014 and over $340,000.00 through November 25, 2015 in exchange for his contractual promises not to compete with AutoNation.

Additionally, Mr. Peters completed highly specialized training at AutoNation's General Manager University, ("GMU"). GMU is a highly specialized and proprietary training program developed and used by AutoNation to refine the skills of existing General Managers and to prepare non-General Managers who excel at their position within the dealership – typically General Sales Managers – to move into a General Manager role with AutoNation. GMU gave Mr. Peters specialized training regarding AutoNation's proprietary, confidential and trade secret information and gave Mr. Peters access to that information.

Mr. Peters has now broken the promises in his Non-Compete Agreement in direct contravention of his obligations to AutoNation, thereby forcing AutoNation to file this motion to enforce Mr. Peters' promises. After Mr. Peters' termination, he accepted employment as the General Manager of an AutoNation competitor, Camelback Ford, where he is able to use AutoNation's specialized and proprietary business information and training to compete against AutoNation in a manner that endangers AutoNation's legally protectable business interests.

Also, before being terminated as General Manager of AutoNation's Ford Scottsdale dealership, Mr. Peters misappropriated selected confidential, proprietary and trade secret AutoNation information. More specifically, between May 5, 2015 and November 6, 2015, Mr. Peters emailed confidential, proprietary and trade secret AutoNation information to Mp32008@me.com, a personal email address used by Mr. Peters. The materials included, among other things, financial material, dealership operating reports and sales trends that contain confidential material not shared by AutoNation with its competitors and not publicly available through proper means. The AutoNation information stolen by Mr. Peters provides him and his new employer, Camelback Ford, with an unfair competitive advantage over AutoNation. Mr. Peters was not authorized by anyone at AutoNation to take this information. This Court should

order Mr. Peters to return all of AutoNation's confidential, proprietary and trade secret information and award additional equitable relief to ensure that Mr. Peters and his new employer have not maintained any copies – electronic, hard copy or otherwise – on any device or in any online account.[1]

Because AutoNation has a legitimate business interest in enforcing Mr. Peters' promises, and because Mr. Peters' conduct presents immediate and irreparable ongoing harm to AutoNation, the Court should enter a preliminary injunction enjoining Mr. Peters from continuing to breach his contractual promises.

Five courts in this jurisdiction – four state courts and one federal court – have found that the information Mr. Peters had access to is protectable business information and have enjoined the type of conduct in which Mr. Peters is engaged. *See AutoNation v. Llerena,* 17 Fla. L. Weekly Supp. 273 (Fla. 17th Cir. Ct. 2009), *aff'd*, 25 So. 3d 696 (Fla. 4th DCA 2010); *AutoNation v. Krohn*, 14 Fla. L. Weekly Supp. 460, 2007 WL 1022698 (Fla. 17th Cir. Ct. 2007); *AutoNation v. Maki*, 11 Fla. L. Weekly Supp. 990, 2004 WL 1925479 (Fla. 17th Cir. Ct. 2004), *aff'd*, 895 So. 2d 453 (Fla. 4th DCA 2005); *AutoNation v. Hankins*, 11 Fla. L. Weekly Supp. 35, 2003 WL 22852206 (Fla. 17th Cir. Ct. 2003); and *AutoNation v. O'Brien*, 347 F. Supp. 2d 1299 (S.D. Fla. 2004). Additionally, AutoNation has been granted injunctive relief against a former AutoNation employee who, like Mr. Peters, stole AutoNation's confidential, proprietary and trade secret information shortly before leaving his employment with AutoNation. *See*

---

[1] Mr. Peters also emailed proprietary AutoNation material to himself at Mp32008@me.com ***before*** May 5, 2015. Regardless of whether he claims he sent this proprietary AutoNation material to his personal email address so he could work on it remotely, he was not authorized to do so. Also, the same information was accessible to Mr. Peters remotely without the need for downloading the material or transmitting it to an external email address. The only reason for sending the proprietary material to his personal email address was to ensure that he had access to the material if he ever left AutoNation.

*AutoNation v. Hatfield*, 13 Fla. L. Weekly Supp. 264 (Fla. 17th Cir. Ct. 2006), *aff'd*, 939 So. 2d 155 (Fla. 4th DCA 2006).

II.     **STATEMENT OF FACTS**

    A.     **AutoNation and the business interests this action seeks to protect.**

AutoNation owns more than 200 vehicle dealerships in 15 states that sell new and used vehicles built by over 30 manufacturers.

As more fully detailed below, certain high-level personnel, including Mr. Peters, have been provided with valuable, confidential AutoNation business information and specialized training as an ongoing investment designed to give AutoNation an advantage over its competitors. A competitor of AutoNation – like Camelback Ford – that obtains the benefit of this information and training by hiring a former AutoNation manager in contravention of his contractual promises thereby gains an unfair competitive advantage over AutoNation in any and every market in which the competitor and AutoNation both operate. For this reason, AutoNation offers its managers, like Mr. Peters, specific and substantial economic benefits in exchange for agreements not to compete with AutoNation (Exhibit A).

This Non-Compete Agreement is critical to the protection of AutoNation's interests, and Mr. Peters' breach of his promises jeopardizes those interests. AutoNation spends millions of dollars, including substantial professional time, gathering, organizing and analyzing valuable and confidential business information from every one of its dealerships regarding sales, service, marketing, information technology, finance and operations, and then provides that information to the field through its regional operations. AutoNation uses personnel whose sole job responsibility is to amass, organize and analyze this valuable and confidential business information. AutoNation also conducts regular and specialized training and monthly operating

review meetings for its dealership management teams regarding the best methods to use this valuable, confidential business information and to compile it into a form and format readily and easily useable.

AutoNation employs personnel whose sole job responsibility it is to analyze and assess AutoNation's historical operations and methodologies to establish the optimum company-wide approach to, among other things, its sales business. AutoNation has developed Best Practices policies at the corporate level that reflect material derived from every AutoNation dealership nationwide and therefore represent an aggregation of the best business strategies and techniques to operate dealerships based on its own experience and confidential and proprietary business information.

The Best Practices information involves a nationwide comparison to other AutoNation dealerships that have successfully implemented and effectuated operations in, among others, the sales departments within each dealership, as well as a multi-year history and projections of operational information and a strategic plan. AutoNation's Best Practices materials have substantial economic value and are not publicly available.

AutoNation has also developed Peer Performance Reports that contain a detailed breakdown and analysis of almost every aspect of its dealership operations. A significant portion of the monthly operating review meetings is devoted to the discussion of the confidential and proprietary information in the Peer Performance Reports and includes, in relevant part, **(a)** information regarding the top five dealerships nationally in each category of operation, including sales; **(b)** detailed reports and analysis of used vehicle departments gross revenues and operating expenses; **(c)** detailed reports and analysis of used vehicle inventory; **(d)** detailed reports and analysis of finance and insurance information regarding sales; and **(e)** a detailed personnel

summary for sales. AutoNation's Peer Performance Reports materials have substantial economic value and are not publicly available.

AutoNation has developed Monthly Operating Review Sheets for each dealership that contains valuable, confidential business information regarding, among other things, gross volume of sales. The reports also contain detailed market analyses, have substantial economic value, and are not publicly available.

AutoNation has also developed an interactive Dealer Central website. This program contains several topics of information that are highly sensitive and treated as confidential by AutoNation. For example, one program, called the ABMT Tool Program, involves a detailed layout of the upcoming year's advertising and marketing strategy and plan, including, but not limited to, where the dealership will focus its advertisements, what media will be used, how much money will be spent, and what customer database market will be targeted. AutoNation's Dealer Central website has substantial economic value and is not publicly available.

The aforementioned computer programs and other information were designed and intended to be for the exclusive use of AutoNation using valuable, confidential business information that is neither readily available to other persons nor permissibly disseminated to the public.

**B.  Mr. Peters' access to AutoNation's valuable and confidential business information and specialized training.**

Mr. Peters was privy to this valuable, confidential business information listed above and his knowledge of this information and use of it in his new employment with Camelback Ford will irreparably damage AutoNation's legitimate business interests.

As General Manager of Ford Scottsdale, Mr. Peters had primary responsibility for the operation, control and supervision of the management and sales teams and reported directly to a

Market President of AutoNation's Western Region. Mr. Peters' duties and responsibilities included managing, supervising, controlling and operating an AutoNation dealership. Operations for which Mr. Peters bore primary responsibility included the sale and lease of new and used vehicles, the service and body departments, finance and insurance, dealership inventory, and implementation of AutoNation's Best Practices and Peer Performance Reports.

### C. Mr. Mr. Peters' promises not to compete with AutoNation and his breach of those promises.

Restrictive covenants (i.e., non-compete agreements) were implemented by AutoNation for reasons including, but not limited to: (a) protection of AutoNation's confidential and proprietary information; (b) avoidance of certain damaging practices AutoNation was aware of in the highly competitive and transient automobile industry; (c) avoidance of solicitation or attempts to solicit current dealership employees by former employees who had left a dealership; and (d) avoidance of unfair competition by former dealership employees against AutoNation in the highly competitive automobile sales industry pursuant to the defined durational and geographical limits in the non-compete agreements. The Non-Compete Agreement signed by Mr. Peters, as more fully described herein, expressly and unambiguously defines the terms and conditions of the prohibited activities.

Mr. Peters' Non-Compete Agreement prevents him from, among other things, working for any AutoNation competitor within fifty (50) miles of the AutoNation Ford Scottsdale dealership or, if outside of the fifty (50) mile radius from Ford Scottsdale, within ten (10) miles of any other AutoNation store in the United States (Exhibit A, at ¶ 6). In the event of a breach of a non-compete agreement, and because AutoNation cannot be adequately compensated as a matter of law, the non-compete agreements provide for injunctive relief and other equitable relief, as well as the right to damages (Exhibit A, at ¶ 7).

Despite the express and unambiguous language in his Non-Compete Agreement, Mr. Peters accepted a position with a direct competitor of AutoNation, Camelback Ford.

D.     **AutoNation's business interests threatened by Mr. Peters' conduct.**

AutoNation's legitimate business interests are threatened by Mr. Peters' ongoing breach of the contractual promises he made.

In his current position with an AutoNation competitor, Mr. Peters is in a position to use AutoNation's confidential and proprietary business information (e.g., what he has learned about AutoNation's policies, practices, business methods, and operations) to compete in a way that would be irreparably detrimental to AutoNation's business interests.  More particularly, the automotive sales and service industry is highly competitive and profit margins are narrow.  Mr. Peters' current employer and AutoNation's dealerships – within the market area covered by the contractual promises Mr. Peters made – compete for essentially the same customers and market share.

The confidential, proprietary business information provided by AutoNation to Mr. Peters and the specialized training provided by AutoNation to Mr. Peters, if used by Mr. Peters, his employer, or other AutoNation competitors within the market area covered by the contractual restrictions, would create an unfair competitive advantage in favor of those competitors and concurrent disadvantage to AutoNation in the new and used vehicle sales, service, finance and insurance, parts and bodywork industry.

Having received the confidential, proprietary information from AutoNation, Mr. Peters is now in a position to use the information to AutoNation's detriment in ways unlikely to be measurable or quantifiable in terms of monetary damages, in that he may use the confidential and proprietary business information he received from AutoNation to compete with AutoNation in a

way that a competitor without this information could not – by using what he learned during his confidential relationship with AutoNation about its policies, practices, business methods, and operations.

The information and training Mr. Peters obtained during his tenure with AutoNation will cause irreparable harm to AutoNation if Mr. Peters is permitted to use it directly or indirectly in the employ of an AutoNation competitor. Enforcement of the geographic scope of Mr. Peters' promises is essential to the protection of AutoNation's legitimate business interests for the time period set forth in those promises.

### III.  MEMORANDUM OF LAW

#### A.  Mr. Peters' misappropriation of AutoNation's confidential, proprietary and trade secret information.

"The law imposes upon every employee a duty not to use the employer's trade secrets for his own benefit, if the secret was acquired by the employee in the course of his employment." *Stoneworks, Inc. v. Empire Marble & Granite, Inc.*, No. 98-2017-Civ, 1998 WL 998962, at *4 (S.D. Fla. Nov. 20, 1998). Under Florida law, a trade secret is broadly defined and includes such items as "compilations," or "programs," that "[d]erive[] independent economic value ... from not being generally known," and that are the subject of reasonable efforts by a company to maintain as secret. Fla. Stat. § 688.002(4). Customer lists, customer purchasing history, customer specifications, pricing and profit structure are all recognized as trade secrets under Florida law. *Vas Aero Services, LLC v. Arroyo*, 860 F. Supp. 2d 1349, 1359 (S.D. Fla. 2012) ("documents containing ... pricing information have been held to constitute trade secrets under Florida law"); *Benada Aluminum of Fla., Inc. v. Rodriguez*, 712 So. 2d 438 (Fla. 3d DCA 1998) (error to dismiss case where employer alleged misappropriation of customer lists, a customer's purchasing history, customer specifications); *Thomas v. Alloy Fasteners, Inc.*, 664 So. 2d 59, 60 (Fla. 5th

DCA 1995) (affirming trial court's injunction prohibiting the use of company's order edit lists, that contained the mark-up on the item ordered, the profit margin and the names of customers); *Bd. of Regents, State of Fla. v. Taborsky,* 648 So. 2d 748, 752 (Fla. 2d DCA 1994) (notebooks containing proprietary and confidential research were trade secrets); *DeLucca v. GGL Indus., Inc.*, 712 So. 2d 1186, 1187 (Fla. 4th DCA 1998) ("documents reflecting income, including rebates from vendors customers' names and address and shipping information" were properly the subject of a permanent injunction); *Sethscot Collection v. Drbul,* 669 So. 2d 1076, 1078 (Fla. 3d DCA 1996) (an active customer list containing "a detailed purchasing history" is a trade secret).

During 2015, while still employed at AutoNation, Mr. Peters accessed AutoNation's computer database and stole confidential, proprietary and trade secret AutoNation material. Based upon Mr. Peters' theft and the violation of his Non-Compete Agreement, AutoNation asks this Court to enjoin Mr. Peters from competing with AutoNation, from using AutoNation's confidential, proprietary and trade secret information for himself or for the benefit of any other person or entity, and compelling him to return the information to AutoNation immediately. *See AutoNation v. Hatfield, supra.*

### B.    Legal Standards for Preliminary Injunctive Relief.

A movant seeking a preliminary injunction is entitled to an injunction when it shows: (1) it has a substantial likelihood of success on the merits; (2) it will suffer irreparable harm unless the status quo is maintained; (3) it has no adequate remedy at law; and (4) a preliminary injunction will serve the public interest. *The Stephan Company v. Faulding Healthcare (IP) Holdings,* 844 So. 2d 676, 678 (Fla. 4th DCA 2003).

As demonstrated herein, AutoNation has each of these elements and is thus entitled to a preliminary injunction against Mr. Peters.

    C.    **AutoNation is substantially likely to prevail on the merits.**

        1.    **AutoNation's Restrictive Covenants and Confidentiality Agreement is enforceable under Florida law.**

Florida Statute § 542.335(1)(b), protects a company's legitimate business interests such as:

    1.    Trade secrets as defined in s. 688.002(4).
    2.    Valuable confidential business or professional information that otherwise does not qualify as trade secrets.
    3.    Substantial relationships with specific prospective or existing customers…
    4.    Customer, … goodwill associated with:…
        b.    A specific geographic location; or
        c.    A specific marketing or trade area [and]
    5.    Extraordinary or specialized training.

Fla. Stat. § 542.335(1)(b).

Here, Mr. Peters signed a Non-Compete Agreement containing an express covenant not to compete that he has violated and that he will continue to violate by unlawfully competing with AutoNation within the geographic area proscribed by the Non-Compete Agreement.

Mr. Peters had access to all the confidential, proprietary information described above and should be enjoined from using such confidential information to benefit his current employer – a direct competitor to AutoNation. This information constitutes "trade secrets" under Florida law. Further, Mr. Peters' employment with Camelback Ford evidences a violation of his Non-Compete Agreement and thus provides more than a substantial likelihood that AutoNation will succeed on the merits of its claim.

    D.    **Mr. Peters' employment with Camelback Ford presents a substantial threat of irreparable harm to AutoNation.**

Florida Statute § 542.335(1)(j), provides that:

> A court shall enforce a restrictive covenant by any appropriate and effective remedy, including, but not limited to, temporary and

permanent injunction. The violation of an enforceable restrictive covenant creates a presumption of irreparable injury to the person seeking enforcement of the restrictive covenant.

Fla. Stat. § 542.335(1)(j).

Section 542.335(1) further requires the party seeking to enforce the covenant to plead and prove the existence of a legitimate business interest. Legitimate business interests are defined as, *inter alia*, extraordinary or specialized training, valuable and confidential business or professional information, substantial relationships with specific prospective or existing clients, customers or patients, and customer, patient or client goodwill associated with a specific geographic location.[2]

When a party seeking enforcement of a restrictive covenant establishes one or more legitimate business interests justifying the restriction, "irreparable injury must be presumed by the Court" and the burden shifts to the employee to establish the absence of such injury. *North American Products Corp.*, 196 F. Supp. 2d at 1230; *see also America II Electronics, Inc. v. Smith*, 830 So. 2d 906, 908 (Fla. 2d DCA 2002) ("a party seeking to enforce a restrictive covenant by injunction need not directly prove that the defendant's specific activities will cause irreparable injury if not enjoined [since] a presumption of irreparable injury" is created by violation of an enforceable restrictive covenant) (citations and internal quotations omitted).

Mr. Peters had access to a wide variety of confidential information and confidential documents while employed at AutoNation. AutoNation has a legitimate business interest in protecting the disclosure or use of its trade secrets or other valuable, confidential business

---

[2] Once the party seeking enforcement of a restrictive covenant establishes a *prima facie* case, the burden shifts to the party opposing enforcement to show that the restriction is overbroad, overlong, or otherwise not reasonably necessary to protect the established interests of the party seeking enforcement. *See North American Products Corp. v. Moore*, 196 F. Supp. 2d 1217, 1228 (M.D. Fla. 2002). Here, both the time period and the geographic scope are reasonably necessary to protect AutoNation's business interests.

information. The use of AutoNation's confidential information and confidential documents presents a substantial threat of irreparable harm. *See Open Magnetic Imaging, Inc. v. Nieves-Garcia*, 826 So. 2d 415, 419 (Fla. 3d DCA 2002) (confidential strategic marketing plan is a legitimate business interest entitled to protection under Fla. Stat. § 542.335); *Lubkey v. CompuVac Systems, Inc.*, 787 So. 2d 121, 124 (Fla. 2d DCA 2001) (proprietary software developed for and at the expense of party seeking injunction is a "legitimate business interest" under Fla. Stat. § 542.335).

Further, the training and experience Mr. Peters obtained during his tenure with AutoNation is sufficient to support enforcement of his restrictive covenant. *Balasco v. Gulf Auto Holding, Inc.*, 707 So. 2d 858, 860 (Fla. 2d DCA 1998) (upholding injunction enforcing covenant not to compete protecting legitimate business interest of an auto dealership in specialized training provided to sales personnel).

The information and training, if used by Mr. Peters or anyone in competition with AutoNation, would create an unfair advantage against AutoNation in the new and used vehicle sales, service, finance and insurance, parts and bodywork industry.

### E. The harm to AutoNation favors the issuance of an injunction.

A consideration of the relative harms between AutoNation and Mr. Peters weighs in favor of the issuance of an injunction. Mr. Peters has accepted a position with a competing dealership. Mr. Peters was privy to and stole valuable AutoNation business information and documents, all of which may be used for the benefit of his current employer and to the detriment of AutoNation. AutoNation's business information was developed over an extended period of time by and at great expense to AutoNation, and the dissemination of this trade secret and other confidential

and proprietary information to AutoNation's competitors will provide them with a tangible advantage in their efforts to compete with AutoNation.

The Florida Legislature has expressly recognized through the enactment of Florida Statute § 542.335 that the violations of covenants not to compete and the misappropriation of trade secrets cannot adequately be remedied by money damages alone and may therefore be enforced through injunctive relief.

### F. An injunction against Mr. Peters will further the public interest.

Florida's public policy favors enforcement of reasonable covenants not to compete and the protection of trade secrets, as evidenced by the Legislature's enactment of Florida Statute § 542.335. As argued more fully above, Mr. Peters has breached a valid, enforceable covenant not to compete. The public interest will be best served by enjoining Mr. Peters' breach of his Non-Compete Agreement.

## IV. CONCLUSION

For all of the foregoing reasons, AutoNation respectfully requests that this Court grant the request for injunctive relief as well as any additional relief the Court deems just and necessary.

WHEREFORE, AutoNation requests that the Court:

A. Enter a preliminary injunction enjoining and restraining Mr. Peters, his agents, servants, employees and attorneys, and all others in active concert or participation with him who receive actual notice thereof by personal service or otherwise, for a period of one year from:

1. Establishing, engaging, owning, managing, operating, controlling or being a director, officer, employee, salesperson, agent, lender or representative of any business in competition with AutoNation; or

  2. Communicating with or soliciting, or encouraging any other person to communicate with or solicit, any person who is, or during said one year period becomes, a customer, supplier, employee, salesperson, agent or representative of AutoNation, or any subsidiary or affiliate of AutoNation;

 B. Enter a preliminary injunction requiring Mr. Peters, his agents, servants, employees, employers and attorneys, and all others in active concert or participation with him who receive actual notice thereof by personal service or otherwise, to return all AutoNation confidential, proprietary and trade secret information in whatever form, and to delete and purge any such information currently in their possession, custody or control from all electronic devices in their possession, custody or control;

 C. Pursuant to the Non-Compete Agreement, Florida Statute §542.335(1)(k), Florida's Trade Secrets Act, and other applicable law, award to AutoNation its costs and expenses of this action, including reasonable attorneys' fees; and

 D. Grant to AutoNation such further relief as this Court deems just, necessary and proper.

        Respectfully submitted,

        s/ Jon K. Stage
        Jon K. Stage (Florida Bar No. 779430)
        Email: jstage@stearnsweaver.com
        Eric K. Gabrielle (Florida Bar No. 160725)
        Email: egabrielle@stearnsweaver.com
        **STEARNS WEAVER MILLER WEISSLER ALHADEFF & SITTERSON, P.A.**
        200 East Las Olas Boulevard, Suite 2100
        Fort Lauderdale, Florida 33301
        Telephone: 954-462-9500
        Facsimile: 954-462-9567
        *Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

WE HEREBY CERTIFY the foregoing was served via CM/ECF on this 8th day of March, 2016, on all counsel or parties of record on the Service List below.

s/ *Jon K. Stage*
Jon K. Stage

## SERVICE LIST

Nolan Klein, Esq.
Law Offices of Nolan Klein, P.A.
Wells Fargo Tower – Suite 1500
One East Broward Boulevard
Fort Lauderdale, FL 33301
Tel: 954-745-0588
Klein@nklegal.com
*Attorneys for Defendant*